UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2005 MAR -4  P 3: 04

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| WENDELL WILLIAMS, individually and On Behalf of All Others Similarly Situated, ) ) ) Plaintiff, ) ) vs. ) ) ELAN CORPORATION, plc, ) G. KELLY MARTIN, LARS ECKMAN ) and SHANE COOKE, ) ) Defendants. ) | **05 10413 JLT** CIVIL ACTION NO. CLASS ACTION COMPLAINT JURY TRIAL DEMANDED |

RECEIPT #_____
AMOUNT $  250.00
SUMMONS ISSUED  4
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK.  M P
DATE  3/4/05

Plaintiff, Wendell Williams ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the

following based upon personal knowledge as to himself and his own acts, and information and

belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

his attorneys, which included, among other things, a review of the defendants' public documents,

announcements made by defendants, United States Securities and Exchange Commission

("SEC") filings, wire and press releases published by and regarding Elan Corporation, plc

("Elan" or the "Company") securities analysts' reports and advisories about the Company, and

other publicly available information.

MAGISTRATE JUDGE_____

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the publicly traded

securities of Elan between February 18, 2004, and February 25, 2005 (the "Class Period"),

seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17

C.F.R. §240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the joint preparation and dissemination of materially false and misleading information with Defendants' joint venturers, occurred in substantial part in this Judicial District. Additionally, the Company maintains a facility in this Judicial District.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff, Wendell Williams, as set forth in the accompanying certification, incorporated by reference herein, purchased Elan securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.    Defendant Elan is a Dublin, Ireland corporation that maintains its principal executive offices at Lincoln House, Lincoln Place, Dublin 2, Ireland.  Defendant Elan maintains a facility at 225 Franklin Street, Floor 26, Boston Massachusetts 02110.

8.    Defendant G. Kelley Martin ("Martin") was, at all relevant times, the Company's President and Chief Executive Officer.

9.    Defendant Lars Eckman ("Eckman") was, at all relevant times, the Company's Executive Vice-President and President, Global Research & Development and

2

Corporate Strategy.

10.    Defendant Shane Cooke ("Cooke") was, at all relevant times, the Company's Executive Vice-President and Chief Financial Officer.

11.    Defendants Martin, Eckman and Cooke are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Elan's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

12.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Elan between February 18, 2004, and February 25, 2005, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

13.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Elan's securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Elan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

14.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful course of conduct in violation of federal law that is complained of herein.

15.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

16.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;
>
> (b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Elan; and

4

(c)    to what extent the members of the Class have sustained damages and the

proper measure of damages.

17.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as

a class action.

## SUBSTANTIVE ALLEGATIONS
### Background

18.    Elan develops, manufactures and commercializes pharmaceutical products. As of

December 31, 2004, it had three commercial products: Tysabri (natalizumab) for the treatment of

relapsing multiple sclerosis (MS), Azactam (rituximab) and Maxipime (cefepime hydrochloride),

both of which are antibiotics for the treatment of infectious diseases in certain patients (the

Company has also recently begun marketing Prialt (ziconotide intrathecal infusion) for the

treatment of certain patients with sever chronic pain). The Company receives revenues from the

sales of these products.

19.    TYSABRI, formerly referred to as ANTEGREN, the first humanized monoclonal

antibody approved for the treatment of MS, inhibits adhesion molecules on the surface of

immune cells. Research suggests TYSABRI works by preventing immune cells from migrating

from the bloodstream into the brain where they can cause inflammation and potentially damage

nerve fibers and their insulation.

20.    Elan and Biogen Idec, Inc. ("Biogen") (collectively, "the Companies"), a

Delaware corporation located in Cambridge, Massachusetts, are collaborating equally on the

5

development of TYSABRI in MS, Crohn's disease (CD), and rheumatoid arthritis (RA).

Regulatory authorities in Canada and Australia have designated TYSABRI for Priority Review

as a treatment for MS, and the European Medicines Agency (EMEA) is actively reviewing the

application.

21.    In September 2004, Elan and Biogen submitted a Marketing Authorization

Application (MAA) to the EMEA for CD based on Phase III studies. Another Phase III induction

trial for CD is ongoing. A Phase II trial is also underway to evaluate TYSABRI in RA. To date,

more than 3,200 patients have received TYSABRI in clinical trials.

### Materially False And Misleading
### Statements Issued During The Class Period

22.    The Class Period starts on February 18, 2004. At that time, the Companies issued

a press release with the headline "Biogen Idec and Elan Announce Intention to Submit

Antegren® for Approval for Multiple Sclerosis Based on One-year Data." Therein, Elan stated:

> Biogen Idec and Elan Corporation, plc today announced that they expect
> to submit to the U.S. Food and Drug Administration (FDA) an application
> for approval of ANTEGREN® (natalizumab) as a treatment for multiple
> sclerosis (MS). The companies expect to submit the filing mid-year 2004.
> The decision to file a Biologics License Application (BLA) was made
> after discussions with the FDA of one-year data from the two ongoing
> two-year Phase III trials in MS. The companies are committed to
> completing the two-year trials. To protect the integrity of the trials, the
> companies are not disclosing the one-year data at this time. Biogen Idec
> and Elan are collaborating equally on the development of natalizumab for
> MS, Crohn's disease, and rheumatoid arthritis.

23.    Also, on February 18, 2004, Elan issued a press release titled "Elan

Reports Fourth Quarter 2003 and Full-Year Financial Results". Therein, the Company

stated:

> Elan demonstrated significant progress during the course of 2003 which
> provides for a strong foundation upon which to build long term value for
> our shareholders. Our focus on execution and operating discipline has

6

enabled us to simplify our balance sheet, increase liquidity and reduce our overall debt and operating costs while achieving continued revenue growth from retained products and services. Importantly, we never wavered from our commitment to invest in and develop our strategic pipeline within our key therapeutic areas of neurology, autoimmune and severe pain. The expected one-year filing for MS, the recent positive Phase III maintenance results in Antegren for Crohn's disease and the successful Phase III trial for Prialt confirms the potential for our world class science to reach those patients who suffer from these diseases. Such execution momentum is the result of focus, dedication and the extraordinary efforts of the Elan employees around the world who remain dedicated to positioning us for success and working towards bringing our scientific innovation to patients.

24.    On March 23, 2004, Elan issued a press release with the headline "Biogen Idec

and Elan Announce Intention to Submit Antegren for Approval for Multiple Sclerosis in

Europe." Therein, the Company stated:

> Biogen Idec and Elan Corporation, plc today announced that they intend to submit to the European Agency for the Evaluation of Medicinal Products (EMEA) an application for approval of ANTEGREN® (natalizumab) as a treatment for multiple sclerosis (MS). The companies expect to submit the filing in the summer of 2004.
> The decision to file was made after discussion with European regulatory officials, based on one-year data from the ongoing Phase III trials in MS. The companies are committed to completing these two-year trials. To protect the integrity of these trials, the companies are not disclosing the one-year data at this time.

25.    On June 4, 2004, Elan issued a press release with the headline "Biogen Idec and

Elan Submit Application to the European Medicines Agency for Approval of ANTEGREN for

Multiple Sclerosis Based on One-Year Data." Therein, the Company stated:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today that they have submitted a Marketing Authorisation Application (MAA) to the European Medicines Agency for approval of ANTEGREN(R) (natalizumab) as a treatment for multiple sclerosis (MS).
>
> The submission includes one-year data from two ongoing Phase III trials. The companies are committed to completing these two-year trials. In order to protect the integrity of the trials, the companies are not disclosing the one-year data at this time. Last month, Biogen Idec and Elan submitted a

Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for the approval of natalizumab for MS.

"Based on the promising results in previous clinical trials and the one-year analysis from our Phase III studies, we believe natalizumab has the potential to meet a significant unmet need for MS patients around the world," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "Natalizumab's novel mechanism of action represents an innovative approach to treating MS."

"This submission represents a significant milestone for Elan and Biogen Idec and demonstrates our ongoing commitment to new therapies for MS patients," said Lars Ekman, MD, executive vice president and president Research & Development, Elan. "We will continue to work with European regulators during the review process to bring natalizumab to patients as quickly as possible."

26.    On June 28, 2004, Elan issued a press release with the headline "FDA Designates

ANTEGREN® Biologics License Application for Priority Review as a Treatment for Multiple

Sclerosis." Therein, the Company stated:

Biogen Idec and Elan Corporation, plc announced today that the Biologics License Application (BLA) for ANTEGREN® (natalizumab) has been designated for Priority Review and Accelerated Approval by the U.S. Food and Drug Administration (FDA) for the treatment of multiple sclerosis (MS). The next step in the process is action by the FDA on formal acceptance of the application, which occurs within 60 days of submission.

The FDA grants Priority Review status to products that are considered to be potentially significant therapeutic advancements over existing therapies that address an unmet medical need. Based on the FDA's designation of Priority Review for natalizumab in MS, the companies anticipate action by the Agency approximately six months from the submission date, rather than 10 months for a standard review. On May 25, 2004, the companies announced they had previously submitted the BLA for the approval of natalizumab for MS. "We are pleased that the FDA has designated natalizumab for Priority Review," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "We look forward to continuing to work with the FDA throughout the review process to provide this potential new therapeutic to patients with MS."

"The Priority Review designation underscores the significant unmet

8

medical need in the area of MS," said Lars Ekman, MD, executive vice president and president, Research & Development, Elan. "We believe natalizumab will offer a new approach to treating MS and will bring hope to patients living with this disease."

The BLA for natalizumab is being evaluated by the FDA under Accelerated Approval guidelines. This review will be based on one-year data from two ongoing Phase III trials. The companies are committed to completing these two-year trials. In order to protect the integrity of the trials, the companies are not disclosing the one-year data at this time.

27.    On July 26, 2004, Elan issued a press release with the headline "FDA Accepts

Biologics License Application For ANTEGREN® for Multiple Sclerosis." Therein, the

Company stated:

Biogen Idec and Elan Corporation, plc announced today that the U.S. Food and Drug Administration (FDA) has formally accepted their Biologics License Application (BLA) for ANTEGREN® (natalizumab). In June 2004, the FDA designated natalizumab for Priority Review and Accelerated Approval for the treatment of multiple sclerosis (MS). Acceptance of a filing indicates that the FDA has determined that the application is complete and permits a substantive review.

The FDA grants Priority Review status to products that are considered to be potentially significant therapeutic advancements over existing therapies that address an unmet medical need. Based on the FDA's designation of Priority Review for natalizumab in MS, the companies anticipate action by the Agency approximately six months from the submission date, rather than 10 months for a standard review. On May 25, 2004, the companies announced they had previously submitted the BLA for the approval of natalizumab for MS.

28.    On November 8, 2004, Elan issued a press release with the headline "Antegren®

One-year Data from Phase III Affirm Study Showed Compelling Results in Meeting Primary

Endpoint in Multiple Sclerosis." Therein, the Company stated:

Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today that one-year data from the Phase III ANTEGREN® (natalizumab) AFFIRM trial met the primary endpoint of clinical relapse rate reduction. In this international study of 942 patients with relapsing-remitting multiple sclerosis (RRMS), natalizumab reduced the rate of relapses by 66 percent compared to placebo, a statistically significant

9

result. All secondary endpoints were also met. These data were presented to investigators involved in the Phase III MS program for natalizumab at a meeting over the weekend. Natalizumab is currently under regulatory review for approval as a treatment for MS.

The AFFIRM study is a two-year trial evaluating the effect of natalizumab on the progression of disability and the rate of relapses in MS. The primary endpoint of the one-year analysis was relapse rate. The companies anticipate that the two-year results will be available in the first half of 2005.

Adverse events occurring in at least 5 percent of natalizumab-treated patients that were 2 percent more common than in placebo-treated patients included headache, fatigue and arthralgia. The overall incidence of infection was similar between the groups. Serious infections occurred in 1 percent of placebo-treated patients and 2 percent of natalizumab-treated patients. Serious hypersensitivity-like reactions occurred in approximately 1 percent of natalizumab-treated patients.

"These data demonstrate that natalizumab dramatically reduced the rate of relapses at one year," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "We believe natalizumab, with its novel mechanism of action, has the potential to be a significant step forward in the treatment of MS."

"Natalizumab has the potential to make a real difference in the lives of MS patients," said Lars Ekman, executive vice president and president, Research and Development, Elan. "We are working closely with regulatory authorities to make natalizumab available to patients in need as soon as we can."

The AFFIRM trial is a two-year, randomized, multi-center, placebo-controlled, double-blind study of 942 patients evaluating the effect of natalizumab monotherapy on the progression of disability in MS and the rate of clinical relapses. Secondary endpoints at one year included the number of new or newly enlarging T2-hyperintense lesions, the number of gadolinium-enhancing lesions and the proportion of patients who were relapse free. To enroll, patients had to be diagnosed with a relapsing form of MS and had to have experienced at least one relapse in the previous year. Patients were randomized to receive a 300 mg IV infusion of natalizumab (n=627) or placebo (n=315) once a month.

"This was a rigorous, well-conducted clinical trial across 99 sites worldwide that yielded compelling one-year results," said Chris Polman, MD, PhD, lead investigator of the AFFIRM study, professor of neurology at Free University Medical Centre, and clinical and scientific director of

the Multiple Sclerosis Centre at the VU Medical
Centre, Amsterdam. "These data suggest that natalizumab may become a
promising new treatment option for patients with MS and could help
address a significant unmet need."

29.    On November 23, 2004, Elan issued a press release with the headline "FDA

Grants Accelerated Approval of Tysabri® Formerly Antegren®, for the Treatment of Multiple

Sclerosis." Therein, the Company stated:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN)
> announced today that the U.S. Food and Drug Administration (FDA) has
> approved TYSABRI® (natalizumab), formerly referred to as
> ANTEGREN®, as treatment for relapsing forms of multiple sclerosis
> (MS) to reduce the frequency of clinical relapses. FDA granted
> Accelerated Approval for TYSABRI following Priority Review based on
> one-year data from two Phase III studies, the AFFIRM monotherapy trial
> and the SENTINEL add-on trial with AVONEX® (Interferon beta-1a).
>
> TYSABRI, the first humanized monoclonal antibody approved for the
> treatment of MS, inhibits adhesion molecules on the surface of immune
> cells. Research suggests TYSABRI works by preventing immune cells
> from migrating from the bloodstream into the brain where they can cause
> inflammation and potentially damage nerve fibers and their insulation.
>
> "TYSABRI is a powerful and innovative therapy that offers new hope for
> hundreds of thousands of people living with MS," said James C. Mullen,
> chief executive officer, Biogen Idec. "We believe TYSABRI will
> revolutionize the treatment of MS and become the leading choice for
> patients and physicians."
>
> "TYSABRI is a significant breakthrough for patients with MS," said Kelly
> Martin, president and chief executive officer, Elan. "The approval of
> TYSABRI, with its unique mechanism of action and new level of efficacy,
> has the potential to make a genuine difference in the lives of patients and
> families who struggle with the debilitating effects of this disease."
>
> Results of the AFFIRM Monotherapy Trial
>
> AFFIRM is a two-year, randomized, multi-center, placebo-controlled,
> double-blind study of 942 patients conducted in 99 sites worldwide, in
> which patients were randomized to receive either a fixed 300 mg IV
> infusion dose of TYSABRI (n=627) or placebo (n=315) every four weeks.
> TYSABRI reduced the rate of clinical relapses by 66 percent relative to
> placebo (p<0.001), the primary endpoint at one-year. The annualized

relapse rate was 0.25 for TYSABRI-treated patients versus 0.74 for placebo-treated patients.

AFFIRM also met all one-year secondary endpoints, including MRI measures. In the TYSABRI-treated group, 60 percent of patients developed no new or newly enlarging T2 hyperintense lesions compared to 22 percent of placebo-treated patients (p<0.001). On the one-year MRI scan, 96 percent of TYSABRI-treated patients had no gadolinium enhancing lesions compared to 68 percent of placebo-treated patients (p<0.001). The proportion of patients who remained relapse free was 76 percent in the TYSABRI-treated group compared to 53 percent in the placebo-treated group (p<0.001).

Results of SENTINEL Add-on Study

Approval was also based on the results of another Phase III clinical trial, SENTINEL. SENTINEL is a two-year, randomized, multi-center, placebo-controlled, double-blind study of 1,171 AVONEX-treated patients in 123 clinical trial sites worldwide.

In the SENTINEL trial, AVONEX-treated patients who continued to experience disease activity were randomized to add TYSABRI (n=589) or placebo (n=582) to their standard regimen.

SENTINEL achieved its one-year primary endpoint. The addition of TYSABRI to AVONEX resulted in a 54 percent reduction in the rate of clinical relapses over the effect of AVONEX alone (p<0.001). The annualized relapse rate was 0.36 for patients receiving TYSABRI when added to AVONEX versus 0.78 with AVONEX plus placebo.

SENTINEL also met all secondary endpoints, including MRI measures. In the group treated with TYSABRI plus AVONEX, 67 percent of patients developed no new or newly enlarging T2 hyperintense lesions compared to 40 percent in the AVONEX plus placebo group (p<0.001). On the one-year MRI scan, 96 percent of TYSABRI plus AVONEX-treated patients had no gadolinium-enhancing lesions compared to 76 percent of AVONEX plus placebo-treated patients (p<0.001). The proportion of patients who remained relapse-free was 67 percent in the TYSABRI plus AVONEX-treated group compared to 46 percent in the AVONEX plus placebo-treated group (p<0.001).

"I believe TYSABRI will be an important therapeutic advance for patients with relapsing MS," said Richard Rudick, MD, lead investigator of the SENTINEL trial and director, Mellen Center for Multiple Sclerosis, Cleveland Clinic Foundation. "Patients who have discontinued therapy, are newly diagnosed with MS, or have persistent active disease despite

being on a current therapy will benefit from TYSABRI." Safety Common adverse events associated with TYSABRI include headache, fatigue, urinary tract infection, depression, lower respiratory tract infection, joint pain and abdominal discomfort. The rate of infection in both studies was approximately one per patient-year in both TYSABRI-treated patients and placebo-treated patients. Serious infections occurred in 1.3 percent of placebo-treated patients and 2.1 percent of TYSABRI-treated patients.

Serious infections included bacterial infections such as pneumonia and urinary tract infection, which responded appropriately to antibiotics. TYSABRI has been associated with hypersensitivity reactions, including serious systemic reactions, which occurred at an incidence of less than 1 percent of patients.

Immunogenicity.

All biologics have the potential to induce patient antibodies. Analysis of the one-year Phase III MS trials indicate a low level of immunogenicity associated with TYSABRI. Patients were tested for antibodies every 12 weeks in the AFFIRM and SENTINEL trials. Antibodies were detected in approximately 10 percent of patients at least once during treatment, with 6 percent of patients remaining persistently positive. Persistently positive antibodies were associated with a substantial decrease in efficacy and an increase in certain infusion-related adverse events. Almost all patients who tested positive for antibodies did so within the first 12 weeks of treatment.

Two-year Results

AFFIRM and SENTINEL are two-year trials. Two-year results are anticipated beginning in the first half of 2005. Patients who complete these trials are eligible for enrollment in a long-term safety extension study.

"The MS community is pleased that the FDA approval of TYSABRI provides an additional treatment option for people with relapsing forms of MS. There are many people living with MS who may benefit from this different treatment approach," said Stephen C. Reingold, PhD, vice president for research, the National MS Society.

30.    On December 21, 2004, Elan issued a press release with the headline "Biogen Idec and Elan Announce Head-to-head Study Comparing Safety and Efficacy of Tysabri® to Rebif." Therein, the Company stated:

Biogen Idec and Elan announced today that they are initiating a head-to-head study comparing the safety and efficacy of TYSABRI®

(natalizumab) to Rebif® (Interferon beta-1a)*. STARS (Study of TYSABRI Against Rebif in relapsing multiple Sclerosis), is a randomized, assessor-blinded, parallel group study that will enroll more than 1,000 multiple sclerosis (MS) patients in North and South America, Europe, Australia, Turkey and Israel.

Patients who enroll in the study will be randomized to either treatment on Rebif, administered subcutaneously at 44 mcg three times per week, or treatment with TYSABRI, administered as a 300 mg IV infusion once every four weeks. The primary endpoint will compare the effect of TYSABRI to Rebif on the rate of clinical relapses. Secondary endpoints include analysis of the proportion of patients remaining relapse free, MRI brain scans, safety, tolerability and quality of life. To help ensure the objectivity of data emerging from STARS, relapses will be assessed and determined in a blinded fashion by an independent panel of experienced neurologists who are not participants in the study. The companies expect to enroll the first patient in STARS in the first quarter of 2005.

"TYSABRI has shown very encouraging efficacy results and a favorable safety profile after one year, both as a monotherapy and as an add-on therapy to AVONEX® (Interferon beta-1a)," said Ludwig Kappos, MD, professor of neurology, Basel University, Switzerland, and member of STARS independent panel. "This head-to-head comparison with Rebif will provide important information that will further assist patients and physicians in making therapeutic choices."

31.    On February 8, 2005, the Company issued a press release announcing its fourth quarter and full year 2004 results. Therein, Elan stated:

Commenting on Elan's business, Kelly Martin, Elan's president and chief executive officer, said, "2004 was an extraordinary year for Elan, with two Elan innovations, Tysabri for multiple sclerosis and Prialt for severe chronic pain, approved in the US, with both therapies advancing in the regulatory process in Europe. For 2005, we look forward to continued growth across the Tysabri franchise, working with our collaborator Biogen Idec ... Our company and our people remain steadfastly focused on our commitment to discover and deliver novel therapeutic approaches for patients with significant unmet medical needs - and to bring sustainable growth and value creation to our shareholders."

Commenting on Elan's fourth quarter and year-end 2004 financial results, Shane Cooke, executive vice president and chief financial officer, said, "2004 has proven to be a transitional year for Elan; we reduced losses by 33% to $0.96 per share; experienced double digit growth in revenues from our remaining business; completed the repositioning of our business and

balance sheet with continued disciplined and focused investment in our core therapeutic areas; expanded our organisation in targeted areas by recruitment of key talent to execute the successful launch of Tysabri and Prialt; and we significantly strengthened our financial position completing a $1 billion plus bond offering. While it is early days, the initial take-up since launch of Tysabri is exceeding all our expectations and we remain optimistic that we will return to profitability by the end of 2006."

The U.S. Food and Drug Administration (FDA) granted accelerated approval of Tysabri in late November 2004. Tysabri is indicated for the treatment of patients in the U.S. with all forms of relapsing remitting multiple sclerosis (MS). Revenue from sales of Tysabri amounted to $6.4 million in the fourth quarter and full-year 2004.

While Elan expects Tysabri to become the market leader in this indication it is too early in the launch to give revenue guidance for this product. However, on the basis of the initial take-up, Elan is optimistic of a return to profitability by the end of 2006.

32.    On February 17, 2005, Elan issued a press release with the headline "Tysabri®

Two-year Monotherapy Trial Demonstrates Significant Impact on Disability Progression and

Relapse Rate in Multiple Sclerosis." Therein, the Company stated:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today that the Phase III TYSABRI® (natalizumab) AFFIRM monotherapy trial achieved the two-year primary endpoint of slowing the progression of disability in patients with relapsing forms of multiple sclerosis (MS). TYSABRI treatment led to a 42 percent reduction in the risk of disability progression relative to placebo. These data also demonstrated a 67 percent reduction in the rate of clinical relapses over two years, which was sustained and consistent with the previously reported one-year results.
>
> Other data from AFFIRM at two years, including MRI measures and immunogenicity were similar to previously reported results.
>
> The adverse event profile at two years was also consistent with previously reported results. Common events included headache, fatigue, urinary tract infection, depression, lower respiratory tract infection, limb and joint pain, and pharyngitis. The incidence of infections in TYSABRI-treated and placebo-treated patients was similar. Serious infections occurred in 3.2 percent and 2.6 percent of patients, respectively. These included bacterial infections such as pneumonia and urinary tract infection, which responded appropriately to antibiotics. TYSABRI has also been associated with

15

hypersensitivity reactions, including serious systemic reactions that occurred at an incidence of less than 1 percent of patients.

"TYSABRI, with its significant effect on slowing the progression of disability, offers new hope for patients with MS," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "With these data, we gain a more complete understanding of the broad therapeutic benefit of TYSABRI in MS."

"Results from the two-year monotherapy clinical trial mark a major milestone in the treatment of MS. These two-year data strengthen our belief that TYSABRI will become the leading therapy for MS patients," said Lars Ekman, MD, executive vice president and president, Research and Development, Elan.

33.    The statements contained in ¶¶ 21-28 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that TYSABRI posed serious immune-system side effects; (2) that TYSABRI, like other MS drugs, made patients susceptible to progressive multifocal leukoencephalopathy ("PML") by changing the way certain white blood cells function thereby allowing PML, a normally dormant virus, to run rampant within the human body; (3) that defendants knew and/or recklessly disregarded documented facts that MS drugs can cause greater incidents of PML to occur; and (4) that defendants concealed these facts in order to fast track TYSABRI for FDA approval so that they could reap the financial benefits from the sales of the drug.

### The Truth Begins to Emerge

34.    On February 28, 2005, before the market opened, Elan issued the following press release:

> Biogen Idec (NASDAQ: BIIB) and Elan Corporation, plc (NYSE: ELN) announced today a voluntary suspension in the marketing of TYSABRI® (natalizumab), a treatment for multiple sclerosis (MS). The companies are suspending supply of TYSABRI from commercial distribution and physicians should suspend dosing of TYSABRI until further notification. In addition, the companies have suspended dosing in all clinical trials.

This decision is based on very recent reports of two serious adverse events that have occurred in patients treated with TYSABRI in combination with AVONEX® (Interferon beta-1a) in clinical trials. These events involve one fatal, confirmed case and one suspected case of progressive multifocal leukoencephalopathy (PML), a rare and frequently fatal, demyelinating disease of the central nervous system. Both patients received more than two years of TYSABRI therapy in combination with AVONEX.

The companies' actions have been taken in consultation with U.S. Food and Drug Administration (FDA). Worldwide regulatory agencies are being kept informed.

The companies will work with clinical investigators to evaluate TYSABRI-treated patients and will consult with leading experts to better understand the possible risk of PML. The outcome of these evaluations will be used to determine possible re-initiation of dosing in clinical trials and future commercial availability.

"Our ongoing commitment to MS patients has led us to take these steps," said Burt Adelman, MD, executive vice president, Development, Biogen Idec. "Because we believe in the promising therapeutic benefit of TYSABRI, we are working to evaluate this situation thoroughly and expeditiously. While we work through this matter, we must place patient safety above all other considerations."

"We are working with leading experts and regulatory agencies to responsibly investigate these events and to develop the appropriate path forward," said Lars Ekman, MD, executive vice president and president, Research and Development, Elan. "Our primary concern is for the safety of patients."

In total, approximately 3,000 patients have been treated with TYSABRI in clinical trials of MS, Crohn's disease, and rheumatoid arthritis. To date, the companies have received no reports of PML in MS patients receiving TYSABRI monotherapy or in patients with Crohn's disease or rheumatoid arthritis in TYSABRI clinical trials. Biogen Idec has received no reports of PML in patients treated with AVONEX alone, a product that has been on the market since 1996.

35.    News of this shocked the market. Shares of Elan fell $18.90 per share, or 70.26

percent, to close at $8.00 on unusually high trading volume.

## UNDISCLOSED ADVERSE FACTS

36.    The market for Elan's securities was open, well-developed and efficient at all

relevant times. As a result of these materially false and misleading statements and failures to disclose, Elan's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Elan securities relying upon the integrity of the market price of Elan's securities and market information relating to Elan, and have been damaged thereby.

37.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Elan's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

38.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Elan's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Elan and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

18

## ADDITIONAL SCIENTER ALLEGATIONS

39.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Elan, their control over, and/or receipt and/or modification of Elan allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Elan, participated in the fraudulent scheme alleged herein.

40.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

41.    At all relevant times, the market for Elan securities was an efficient market for the following reasons, among others:

(a)    Elan stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Elan filed periodic public reports with the SEC;

(c)    Elan regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Elan was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

42.    As a result of the foregoing, the market for Elan securities promptly digested current information regarding Elan from all publicly-available sources and reflected such information in Elan stock price. Under these circumstances, all purchasers of Elan securities during the Class Period suffered similar injury through their purchase of Elan securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

43.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Elan who knew that those statements were false when

made.

### FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

44.     Plaintiff repeats and re-alleges each and every allegation contained above as if

fully set forth herein.

45.     During the Class Period, defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

other members of the Class to purchase Elan securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them,

took the actions set forth herein.

46.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Elan securities in violation of Section 10(b) of the

Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the

wrongful and illegal conduct charged herein or as controlling persons as alleged below.

47. Defendants, individually and in concert, directly and indirectly, by the use, means or

21

instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Elan as specified herein.

48.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Elan value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Elan and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Elan securities during the Class Period.

49.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they

knew or recklessly disregarded was materially false and misleading.

50.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Elan's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

51.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Elan securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Elan's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Elan securities during the Class Period at artificially high prices and were damaged thereby.

52.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the

23

other members of the Class and the marketplace known the truth regarding the problems that

Elan was experiencing, which were not disclosed by defendants, Plaintiff and other members of

the Class would not have purchased or otherwise acquired their Elan securities, or, if they had

acquired such securities during the Class Period, they would not have done so at the artificially

inflated prices which they paid.

53.    By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

54.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

55.    Plaintiff repeats and re-alleges each and every allegation contained above as if

fully set forth herein.

56.    The Individual Defendants acted as controlling persons of Elan within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

statements which Plaintiff contend are false and misleading. The Individual Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public

24

filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

58.    As set forth above, Elan and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses

25

incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  March 4, 2005.

LAW OFFICES OF PETER A. LAGORIO

Peter A. Lagorio (BBO#567379)
63 Atlantic Avenue
Boston, MA 02110
Tel: (617) 367-4200
Fax: (617) 227-3384

Dennis J. Johnson, Esq.
Robin A. Freeman, Esq.
JOHNSON & PERKINSON
1690 Williston Road
P.O. Box 2305
South Burlington, VT 05403
Tel: (802) 862-0030
Fax: (802) 862-0060
**Plaintiff's Counsel**

## PLAINTIFF'S CERTIFICATION OF SECURITIES CLASS ACTION COMPLAINT

I, Wendell Williams, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.    I have reviewed the Complaint to be filed in this action (the "Complaint").

2.    I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

3.    My transaction(s) in Elan Corp., plc securities during the Class Period are as follows:

| Date: | Number of Shares Purchased/Sold: | Price: |
|---|---|---|
| | see attached list | |

4.    I did not purchase these securities at the direction of my counsel, or in order to participate in any private action arising under any Federal Securities laws.

5.    During the three year period preceding the date of my signing this Certification, I have not sought to serve, nor have I served, as a representative to any party on behalf of a class in any private action arising under the Federal Securities laws other than as listed below:

*Williams, et al. v. Worldcom, Inc., et al.*
*Williams, et al. v. Tyco International, Ltd.*
*Williams, et al. v. Andrx Corporation, et al.*
*Williams, et al. v. Vaxgen Corporation, et al.*

6.    I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata of any possible recovery, except for an award, as ordered or approved by the court, for reasonable costs and expense (including lost wages) directly relating to my representation of the Class.

Signed under the penalties of perjury this _4_ day of March, 2005.

WENDELL WILLIAMS

**ADRS OF ELAN CORPORATION, plc PURCHASED BY
PLAINTIFF WENDELL WILLIAMS**

| Date | Number of Shares Purchased | Price |
|------|---------------------------|-------|
| 3/8/04 | 1000 | 17.45 |
| 3/17/04 | 1000 | 17.66 |
| 3/23/04 | 1000 | 19.92 |
| 5/21/04 | 1000 | 22.00 |
| 6/2/04 | 200 | 23.34 |
| 7/15/04 | 1000 | 25.50 |
| 11/15/04 | 2000 | 30.24 |

In addition, I have purchased a number of Elan Corporation option contracts and I am currently compiling these purchases. I believe that I have suffered substantial losses in these securities as well and will file an amended Certification at such time as I have compiled all of the necessary information.

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED IN CLERKS OFFICE

## I. (a)   PLAINTIFFS

Wendell Williams, individually and on behalf of all other similarly situated,

**DEFENDANTS**

Elan Corporation, plc, G. Kelly Martin, Lars Eckman and Shane Cooke,

2005 MAR -4  P 3: 04

**(b)**   County of Residence of First Listed Plaintiff   Albany, NY
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED. DISTRICT OF MASS.

**(c)**   Attorney's (Firm Name, Address, and Telephone Number)

Law Office of Peter A. Lagorio, 63 Atlantic Ave., Boston, MA 02110
(617) 367-4200

Attorneys (If Known)

05 - 10413 JLT

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1   U.S. Government Plaintiff | ☒ 3   Federal Question (U.S. Government Not a Party) |
| ☐ 2   U.S. Government Defendant | ☐ 4   Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity)

15 U.S.C. 78 j(b) and 78 t(a)

Brief description of cause:

fraud in connection with the purchase of securities

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)   JUDGE _____   DOCKET NUMBER _____

DATE   3/4/05

SIGNATURE OF ATTORNEY OF RECORD   Peter Lagorio   (BBO 567379)

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED

1. Title of case (name of first party on each side only)    Wendell Williams v. Elan Corporation, PLC, Et al.

2005 MAR -4 P 3: 04

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local
   rule 40.1(a)(1)).

U.S. DISTRICT COURT
DISTRICT OF MASS.

|   | I. | 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT. |
|---|----|---------------------------------------------------|
| ✓ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121<br>740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases |
|   | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,<br>315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,<br>380, 385, 450, 891. |
|   | IV. | 220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,<br>690, 810, 861-865, 870, 871, 875, 900. |
|   | V. | 150, 152, 153. |

**05   10413 JLT**

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this
   district please indicate the title and number of the first filed case in this court.
   n/a

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐    NO ✓

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC
   §2403)
   YES ☐    NO ✓

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐    NO ☐  n/a

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐    NO ✓

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
   Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☐    NO ✓

   A.    If yes, in which division do all of the non-governmental parties reside?
   Eastern Division ☐    Central Division ☐    Western Division ☐

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
   residing in Massachusetts reside?
   Eastern Division ✓    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes,
   submit a separate sheet identifying the motions)
   YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME    Peter A. Lagorio
ADDRESS    Law Office of Peter A. Lagorio, 63 Atlantic Ave., Boston, MA 02110
TELEPHONE NO.    (617) 367-4200

(CategoryForm.wpd - 2/15/05)